UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DEBORAH CLAY, an individual and as the Successor in Interest to the Estate of RODNEY CLAY; RODNEY CLAY, JR.; VELICIA HAMILTON; TAMIKO MOON; and THOMASINA CLAY,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE PERMANENTE MEDICAL GROUP, INC.; KAISER FOUNDATION HOSPITALS; KAISER FOUNDATION HEALTH PLAN; and DOES 1-200, inclusive,<br><br>    Defendants. | No. 06-7926 SC<br><br>ORDER GRANTING DEFENDANTS' MOTION TO <u>COMPEL ARBITRATION</u> |

**I.   INTRODUCTION**

Plaintiffs Deborah Clay, individually and as the successor in interest to the estate of Rodney Clay, Rodney Clay, Jr., Velicia Hamilton, Tamiko Moon, and Thomasina Clay ("Plaintiffs") brought this suit against the Permanente Medical Group, Inc., Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan ("Health Plan") (collectively "Defendants" or "Kaiser"), asserting nine claims related to Kaiser's alleged mishandling of a kidney transplant for Rodney Clay.  See Notice of Removal, Docket No. 1, Ex. A ("Complaint").  Defendants removed the action from the Alameda County Superior Court to this Court, asserting

1  jurisdiction pursuant to the Medicare Act, 42 U.S.C. § 1395
2  et seq., and the Employee Retirement Income Security Act of 1974
3  ("ERISA"), 29 U.S.C. § 1001, et seq. See id. Defendants now move
4  the Court to compel arbitration of all claims other than the claim
5  for injunctive relief, and to stay this action pending
6  arbitration. Mot. to Compel Arbitration ("Motion"), Docket No. 8.
7  Plaintiffs filed an Opposition to the Motion, and Defendants filed
8  a Reply. See Docket Nos. 27, 28. The parties appeared before the
9  Court and argued the merits of the Motion on November 30, 2007.
10  Having considered all of the arguments and submissions of the
11  parties, the Court hereby GRANTS Defendants' Motion.

**II.  BACKGROUND**

14  In November 1991, Deborah Clay enrolled herself and her
15  husband Rodney Clay as members of the Health Plan, pursuant to an
16  agreement between the Health Plan and her employer, Integrated
17  Device Technology. Dean Decl. ¶ 3. In 1994, the Health Plan
18  entered into a Medicare Risk Contract with the Health Care
19  Financing Administration to provide medical and hospital services
20  for enrolled Medicare beneficiaries.[1] See Hall Decl. ¶¶ 2, 4.
21  When a Health Plan member expressed interest in enrolling in
22  the Health Plan Senior Advantage program (Health Plan's name for
23  its Medicare Advantage offering), Health Plan sent the member

---

[1] The Health Care Financing Administration was renamed the Centers for Medicare & Medicaid Services ("CMS"). Hall Decl. ¶ 2. The Medicare Risk Contract was renamed Medicare+Choice Contract in 1999, and then renamed again as Medicare Advantage. Id. ¶ 3. The Court will use the current terms, CMS and Medicare Advantage.

2

1  copies of the Health Plan Senior Advantage Election form and the
2  Health Plan Senior Advantage Membership Agreement, also known as
3  the Evidence of Coverage ("EOC").  Hall Decl ¶ 5.  The EOC
4  summarizes the Health Plan Senior Advantage coverage, and is
5  subject to the Health Plan's Medicare Advantage contract with the
6  CMS.  Id.  The Health Plan Senior Advantage EOC has always
7  contained an arbitration clause.  Id.

8  The Health Plan revises the EOC annually.  Id. ¶ 6.  Each
9  year, the Health Plan submits to the CMS its proposed changes to
10 the EOC for the following year.  Id.  Once CMS approves the
11 changes, Health Plan mails a copy of the EOC and a letter
12 summarizing the revisions to all Health Plan Senior Advantage
13 enrollees.  Id.

14 In July 2000, Rodney Clay enrolled as a member of the Health
15 Plan Senior Advantage.  See Dean Decl. ¶ 4.  On the Senior
16 Advantage Election form which Mr. Clay signed, the following text
17 appears above his signature:

> I have read, understand, and agree to the statements on
> the reverse side of this Election Form including the
> restrictions on the use of non-Plan providers.  I hereby
> apply for Kaiser Permanente Senior Advantage membership.
> I understand that except for Small Claims Court cases
> and claims subject to the Medicare Appeals Procedure,
> any claim that I, my heirs, or other claimants
> associated with me, assert for alleged violation of any
> duty arising out of or relating to membership in Health
> Plan, including any claim for medical or hospital
> malpractice, for premises liability, or relating to the
> coverage for, or delivery of services, or items,
> irrespective of legal theory, must be decided by binding
> arbitration under California law and not by a lawsuit or
> resort to court process except as California law
> provides for judicial review of arbitration proceedings.
> I agree to give up my right to a jury trial and accept
> the use of binding arbitration.

3

1  Id. Ex. C.  Mr. Clay's coverage under the Health Plan Senior
2  Advantage program became effective on August 1, 2000.  Id. ¶ 4.
3      Plaintiffs are the wife and grown children of Rodney Clay.
4  Compl. ¶¶ 3-7.  Plaintiffs allege as follows.  In early 2000, Mr.
5  Clay suffered kidney failure.  Because Kaiser did not at that time
6  operate its own kidney transplant center, Kaiser referred Mr. Clay
7  to the UCSF Medical Center's kidney transplant program.  Id. ¶¶
8  29, 31.  UCSF informed Mr. Clay that the typical wait was two to
9  three years for a replacement kidney.  Id. ¶ 31.  Four years later,
10 when Mr. Clay was supposedly near the top of the UCSF transplant
11 list, Kaiser informed Mr. Clay that it had opened a transplant
12 center and that he would be transferred to the Kaiser program that
13 September.  Id. ¶¶ 32, 33.  Finally, Plaintiffs allege that in the
14 year following Mr. Clay's transfer to the Kaiser transplant
15 program, Kaiser repeatedly delayed the transplant, only to refer
16 him back to UCSF.  Id. ¶ 37.  Before Kaiser completed the
17 paperwork necessary for the transfer, Rodney Clay died of chronic
18 renal failure.  Id. ¶ 39.
19      Based on these allegations, Plaintiffs brought nine causes of
20 action against Kaiser: (1) survival and wrongful death based on
21 negligence; (2) fraud, deceit, and fraudulent concealment; (3)
22 negligent misrepresentation; (4) negligence per se; (5)
23 intentional infliction of emotional distress; (6) negligent
24 infliction of emotional distress; (7) violation of California
25 Business & Professions Code section 17200, et seq.; (8) violation
26 of California Business & Professions Code section 17500, et seq.;
27 and (9) wrongful death due to breach of contract and tortious
28

4

1  breach of the implied covenant of good faith and fair dealing.
2  See id.  Plaintiffs seek to recover compensatory and punitive
3  damages, attorneys' fees and costs, and injunctive relief.
4  Defendants asked if Plaintiffs would agree to submit this
5  dispute to arbitration.  Plaintiffs refused.  Lamb Decl. ¶ 2.
6  Defendants therefore brought this Motion.

### III. ANALYSIS

#### A. Applicability of the Federal Arbitration Act

Section 2 of the Federal Arbitration Act ("FAA") provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Kaiser asserts that Health Plan's Senior Advantage Election Form involves commerce, and that the arbitration provision in that document is therefore enforceable under the FAA.  See Mot. at 5-6.  The Supreme Court has interpreted the phrase "involving commerce" very broadly, holding that it extends beyond "persons or activities within the flow of interstate commerce" to include anything that affects commerce. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273, 277 (1995).  In certain circumstances, the Health Plan pays for its members to receive medical services when they are traveling outside of California.  See Hall Decl. Ex. A at 11, 16.  Health Plan also provides coverage authorized by Medicare, a federal statute exercising the Commerce power.  Applying the broad

5

legal standard described above, the Court concludes that Health Plan's Senior Advantage Election form evidences a transaction involving commerce, and that the FAA is therefore applicable. Other courts have reached the same conclusion. See <u>Schlegel v. Kaiser Found. Health Plan, Inc.</u>, No. 07-CV-00520-MCE, 2007 U.S. Dist. LEXIS 64299, *3-4 (E.D. Cal. Aug. 30, 2007); <u>Mannick v. Kaiser Found. Health Plan, Inc.</u>, No. C 03-5905 PJH, 2005 U.S. Dist. LEXIS 40405, *6-7 (N.D. Cal. Dec. 16, 2005); <u>Toledo v. Kaiser Permanente Med. Group</u>, 987 F. Supp. 1174, 1180 (N.D. Cal. 1997).

Where a valid and enforceable written arbitration agreement governs a dispute in litigation, the FAA authorizes the Court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . ." 9 U.S.C. § 3. "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. . . .  The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."  <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1., 24-25 (1983).

**B.  California Health & Safety Code Section 1363.1**

The FAA encourages arbitration where there is a valid and enforceable agreement.  Here, Plaintiffs argue that the arbitration agreement contained in the enrollment form Mr. Clay signed is unenforceable because it violates the notice and disclosure requirements of California Health & Safety Code section 1363.1.

6

Section 1363.1 establishes conditions for any health care service plan that "includes terms that require binding arbitration to settle disputes and that restrict, or provide for a waiver of, the right to a jury trial. . . ." Cal. Health & Safety Code § 1363.1. Plaintiffs assert that Defendants' arbitration agreement violates Section 1363.1(b), which requires that the arbitration agreement be "prominently displayed on the enrollment form signed by each subscriber or enrollee;" Section 1363.1(c), which requires that the arbitration agreement be "substantially expressed in the wording provided in subsection (a) of Section 1295 of the Code of Civil Procedure;" and Section 1363.1(d), which requires that the disclosure be displayed "immediately before the signature line for the individual enrolling in the health care plan." Id.

Under California law, compliance with Section 1363.1 is mandatory, and failure to comply voids an arbitration agreement:

> Section 1361.1, therefore, establishes the requirements that _must_ _be_ _satisfied_ in order to arbitrate disputes involving a health care service plan. Accordingly, even though section 1363.1 is silent on the effect of noncompliance, because the disclosure requirements are mandatory, the failure to comply with those requirements renders an arbitration provision unenforceable.

Malek v. Blue Cross of Cal., 121 Cal. App. 4th 44, 64 (Ct. App. 2004) (emphasis in original).

**C.   The Medicare Act Preempts Section 1363.1**

Although Defendants assert that their enrollment form and EOC comply with Section 1363.1, their primary position is that the Court need not consider Section 1363.1 because it is preempted by

7

1  the Medicare Act.[2]  The Court agrees.

2         1.   <u>Preemption Standards</u>

3  "Where (as here) Congress regulates a field historically
4  within the police powers of the states (public health), we proceed
5  from the assumption that state law is not superseded unless there
6  is a 'clear and manifest purpose of Congress' to foreclose a
7  particular field to state legislation." <u>Pagarigan v. Sup. Ct. of</u>
8  <u>Los Angeles County</u>, 102 Cal. App. 4th 1121, 1128 (Ct. App. 2002)
9  (citing <u>Medtronic, Inc. v. Lohr</u>, 518 U.S. 470, 485 (1996)).

10 Preemption may be either express or implied. <u>Id.</u> "[W]hen
11 Congress has 'unmistakably. . . ordained,' that its enactments
12 alone are to regulate a part of commerce, state laws regulating
13 that aspect of commerce must fall." <u>Jones v. Rath Packing Co.</u>,
14 430 U.S. 519, 525 (1977) (quoting <u>Fla. Lime & Avocado Growers,</u>
15 <u>Inc. v. Paul</u>, 373 U.S. 132, 142 (1963)). Implied preemption may
16 take either of two forms:

> Absent explicit pre-emptive language, we have recognized
> at least two types of implied pre-emption: field
> pre-emption, where the scheme of federal regulation is so
> pervasive as to make reasonable the inference that
> Congess left no room for the States to supplement it, and
> conflict pre-emption, where compliance with both federal
> and state regulations is a physical impossibility, or
> where state law stands as an obstacle to the

---

[2] Defendants initially took the position that the FAA also preempts application of Section 1363.1, but abandoned this argument in their Reply and did not assert it at oral argument. <u>See</u> Reply at 1 ("Defendants acknowledge that the McCarran-Ferguson Act immunizes section 1363.1, Calif. Health & Safety Code, from what would otherwise be a clear-cut case of preemption by the Federal Arbitration Act."); <u>see also</u> <u>Smith v. Pacificare Behavioral Health of Cal., Inc.</u>, 93 Cal. App. 4th 139, 162 (Ct. App. 2001) ("[T]he FAA, a federal statute of general application, which does not 'specifically relate' to insurance, is foreclosed from application to prevent the operation of section 1363.1.").

1  accomplishment and execution of the full purposes and
2  objectives of Congress.

3  Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992)
4  (internal citations and quotations omitted).

5  Where there is a question about the scope of a statute's preemptive effect, courts look to the congressional purpose, "as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Medtronic, 518 U.S. at 485.

### 2. Applicable Law

The Court examines the Medicare Act "as it read at the time relevant to this case." See McCall v. Pacificare of Cal., 25 Cal. 4th 412, 422 (2001). Congress amended the preemption provisions of the Medicare Act in 2000 and in 2003. See Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000, H.R. 5661, enacted by Pub. L. No. 106-54, 114 Stat. 2763 (2000) ("BIPA"); Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003) ("MMA").

Mr. Clay enrolled in the Health Plan Senior Advantage program in July, 2000. The front of the enrollment form mentions binding arbitration in a block of text immediately preceding Mr. Clay's signature, but it also says, "Please read the Conditions of Election and Authorization to Exchange Information on the back of

9

this form."  Dean Decl. Ex. C.[3]  On the back of that form, the first paragraph appears as follows:

> Conditions of Election
>
> If you are electing Kaiser Permanente Senior Advantage Coverage, be certain that you fully understand the arbitration provision, benefits, limitations and conditions, which are described in the Kaiser Permanente Senior Advantage Group Disclosure Form and Evidence of Coverage or the Individual Membership Agreement and Disclosure Form and Evidence of Coverage.

Id. Ex. D.  The Court interprets this text to mean that the full terms of the enrollee's agreement with Defendants, including the arbitration provision, are set forth in the Senior Advantage Group Disclosure Form and Evidence of Coverage.  Jason Hall, Health Plan's Director of Medicare Compliance, testified by declaration that Health Plan sends the current EOC to any Health Plan member who expressed interest in the Senior Advantage Program.  Hall Decl. ¶ 5.  Hall further states that the EOC has always contained an arbitration provision.  Id.  Each year, when Health Plan sends its proposed revisions to the EOC to CMS for review, it sends an Annual Notice of Changes describing the revisions to each Senior Advantage enrollee, followed by a copy of the final, approved EOC.  Id. ¶ 6.

The series of events purportedly giving rise to Plaintiffs' claims appears to have begun on June 22, 2004, when Defendants

---

[3] This text appears in bold print, in a different font from other parts of the enrollment form, and is surrounded by a black box which separates it from the rest of the form.  See Dean Decl. Ex. C.  At oral argument, Plaintiffs' counsel repeatedly drew the Court's attention to this box as an example of Defendants' ability to highlight important text on the enrollment form, purportedly to support Plaintiffs' claim that the arbitration provision was not itself prominently displayed.

10

told Mr. Clay he would have to transfer out of the UCSF transplant program and into Kaiser's program. See Compl. ¶ 33. The operative version of the EOC, then, is the version that took effect on June 1, 2004. See Hall Decl. Ex. A. The Health Plan submitted this version to the CMS for review during 2004. See id.

Because the events giving rise to this suit took place in 2004, and the arbitration provision governing the suit was executed in that year (by CMS-approved amendment to the prior EOC), the Court concludes that the applicable version of the Medicare Act is that which was in effect in June of 2004, and which remains in effect today.

### 3. Preemption Analysis

The Medicare Act explicitly preempts application of state law to the arbitration agreement at issue here. After the most recent amendment, the Medicare Act preempts all state regulation of Medicare Advantage plans not relating to licensing or plan solvency:

> Relation to State laws. The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

42 U.S.C. § 1395w-26(b)(3). The standards established under this statute include 42 C.F.R. § 422.80, "Approval of marketing materials and election forms," and 42 C.F.R. § 422.111, "Disclosure requirements." These regulations set forth the rules governing approval and distribution of Medicare Advantage information to enrollees.

Specifically, 42 C.F.R. § 422.80(c) provides the guidelines

11

for CMS review of Medicare Advantage marketing materials. The CMS review process checks to make sure that the disclosure is printed in a proper format and text size. Id. § 422.80(c)(1). The CMS also reviews the marketing materials to determine whether they include an "[a]dequate written explanation of the grievance and appeals process, including differences between the two, and when it is appropriate to use each." Id. § 422.80(c)(1)(iii).

These regulations apply to all "marketing materials," as that term is defined in 42 C.F.R. § 422.80(b). This includes any informational materials targeted at Medicare Advantage beneficiaries which, among other things, "explain the benefits of enrollment in an MA plan, or rules that apply to enrollees." Id. § 422.80(b)(3) (emphasis added). The regulation provides a number of examples of marketing materials, including, "[m]embership communication materials such as membership rules, subscriber agreements (evidence of coverage), member handbooks and wallet card instructions to enrollees." Id. § 422.80(b)(5)(v) (emphasis added).

The operative arbitration provision in this dispute is contained in the June 2004 EOC. By federal regulation, the EOC is considered "marketing material" and must be approved by the CMS. The CMS has a set of standards it uses in evaluating marketing materials, including the adequacy of the formatting and font size and the adequacy of the description of any grievance procedures. Pursuant to 42 U.S.C. § 1395w-26(b)(3), these regulations supersede any state law or regulation with respect to Medicare Advantage plans such as the Health Plan Senior Advantage plan in

12

which Mr. Clay was enrolled. To the extent California Health & Safety Code section 1363.1 purports to regulate the adequacy of any disclosures in the EOC, it is superseded by federal law, and its application here is preempted.

Congressional intent confirms this result. The Conference Report accompanying the MMA clearly demonstrates that, in amending 42 U.S.C. 1395w-26, Congress intended to broaden the preemptive effects of the Medicare statutory regime, and that it intended to apply the new rules to all subsequent litigation:

> The conference agreement clarifies that the MA program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency. There has been some confusion in recent court cases. This provision would apply prospectively; thus, it would not affect previous and ongoing litigation.

H.R. Rep. No. 108-391, at 557 (2003).

At oral argument, Plaintiffs' counsel advanced two arguments against preemption. First, counsel asserted that because Section 1363.1 does not conflict with federal law – that is, compliance with one does not require violation of the other – federal law does not preempt. Second, counsel relied on the decision in Pagarqiqan, where the California Court of Appeal, on very similar facts, found that the Medicare Act did not preempt application of Section 1363.1. See 102 Cal. App. 4th at 1135-36. Both arguments fail because they rely on older versions of the Medicare Act.

Prior to the passage of the BIPA in 2000, Congress had not explicitly preempted state regulation of Medicare Advantage marketing materials. As such, preemption analysis required a court to consider whether compliance with both federal and state

13

law was possible.  In that situation, it was permissible for states to impose higher standards than federal law did.  Because the preemption is now explicit, the state regulations must fall.  See Jones, 430 U.S. at 525.

The Pagarigan court followed the implied preemption analysis in reaching its conclusion that Section 1363.1 was not preempted.  See 102 Cal. App. 4th at 1147 ("As Congress has expressly stated, state standards regarding matters outside the specified areas are superseded only to the extent any state regulation is 'inconsistent' with such federal regulations." (citing previous version of 42 U.S.C. § 1395w-26(b)(3)(A)) (emphasis in original).  Under the facts of that case, application of the older preemption statute was appropriate.  Pagarigan had enrolled in the Medicare program in 1995, the governing EOC had been approved in January 2000, and Pagarigan died in June 2000.  Id. at 1149.  All of this preceded passage of the BIPA, when Congress first made the decision to explicitly preempt state regulation of Medicare marketing materials such as the EOC.  Id.  The same was true in Zolezzi v. Pacificare of Cal., 105 Cal. App. 4th 573 (Ct. App. 2003), on which Plaintiffs also rely.  Id. at 588 ("However, that provision was added by BIPA's amendment of the Act on December 21, 2000, which was subsequent to all of the relevant or operative acts and omissions of which Zolezzi complains in her first amended complaint.").  Here, the explicit preemption was well-established before the CMS reviewed and approved the governing EOC, and before Defendants are alleged to have committed any of the wrongful acts identified in the Complaint.  Nothing in Pagarigan compels a

1 different result.

   **D.   <u>Applicability of the Arbitration Agreement to Plaintiffs</u>**

Plaintiffs argue that because they are not signatories to the arbitration agreement, even if the Court finds that agreement enforceable, it should not apply to them. Opp'n at 11. Defendants argue that the arbitration provisions in the applicable EOC extend to the enrollee's heirs or personal representatives (i.e., Plaintiffs), and that because Plaintiffs bring claims on behalf of the estate, they stand in Mr. Clay's shoes and are bound by his agreement.

The EOC includes the following provisions regarding the scope of arbitration:

> Any dispute shall be submitted to binding arbitration if all of the following requirements are met:
>
> 1.  The claim arises from or is related to an alleged violation of any duty incident to or arising out of relating to this EOC or a Member Party's relationship to Kaiser Foundation Health Plan, Inc., (Health Plan), including any claim for medical or hospital malpractice, for premises liability, or relating to the coverage for, or delivery of, Services, irrespective of the legal theories upon which the claim is asserted.
>
> 2.  The claim is asserted by one or more Member Parties against one or more Kaiser Permanente Parties or by one or more Kaiser Permanente Parties against one or more Member Parties.

Hall Decl. Ex. A (2004-2005 EOC), at 35-36.[4] The EOC further defines "Member Parties" to include the plan member, the member's heir or personal representative, or any "person claiming that a duty to him or her arises from a Member's relationship to one or

---

[4] The EOC includes other requirements not material to this dispute.

15

more Kaiser Permanente Parties." Id. at 36.

Because Mr. Clay agreed to the terms of the EOC, his estate is bound by its terms. Therefore, the various causes of action in the Complaint which are brought on behalf of the estate must be submitted to arbitration. At a minimum, this includes the first, second, third, and fourth causes of action, each of which alleges that Defendants caused some financial injury to Mr. Clay and seeks to recover for that injury. See County of Los Angeles v. Super. Ct., 21 Cal. 4th 292, 304 (1999) ("In a survival action by the deceased plaintiff's estate, the damages recoverable expressly exclude 'damages for pain, suffering, or disfigurement.' . . . They do, however, include all 'loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages.'") (citing Cal. Code Civ. Proc. § 377.34).

Plaintiffs correctly identify a split in the California Courts of Appeals regarding the applicability of binding arbitration provisions to non-signatory adult heirs. Two lines of cases may apply. The first follows Rhodes v. California Hospital Medical Center, 76 Cal. App. 3d 606 (Ct. App. 1978); the second follows Herbert v. Superior Court of Los Angeles County, 169 Cal. App. 3d 718 (Ct. App. 1985). Though Plaintiffs identify the split, they fail to provide any reason the Court should follow one line of cases over the other in this matter.

Plaintiffs rely on Rhodes and its progeny. For the reasons set forth in Herbert, on which Defendants rely, Rhodes is distinguishable. Unlike the arbitration provision in Herbert and

16

1  the one in the EOC, the agreement in Rhodes did not have a
2  provision through which the signing party intended to bind her
3  heirs.  See Herbert, 169 Cal. App. 3d at 725 n.2; Rhodes, 76 Cal.
4  App. 3d at 608-09.  It is also relevant that in Rhodes, the estate
5  was not a plaintiff and there were no survival claims at issue.
6  See Rhodes, 76 Cal. App. 3d at 609 ("This arbitration proceeding
7  does not, at this stage, involve any question as to the existence
8  of a cause of action in Mrs. Rhodes. . . . We are here concerned
9  solely with the forum in which a new cause of action in the heirs
10 may be brought.").

11         Similarly, in Baker v. Birnbaum, 202 Cal. App. 2d 288, 292
12 (Ct. App. 1988), which follows Rhodes, there was "nothing on the
13 face of the . . . contract that extend[ed] it to any claim by" the
14 plaintiff.  Other facts in Baker distinguish it from the present
15 matter as well.  The suit did not involve a claim for wrongful
16 death, and the plaintiff, who was not required to arbitrate, was
17 not suing on behalf of a decedent's estate.  Id. at 290.  As
18 discussed below, in reference to Herbert, each of these factors is
19 significant.  In Baker, a husband and wife each brought claims
20 against the wife's doctor.  The wife's claim was for negligence,
21 the husband's for loss of consortium.  Id. at 290.  The court
22 compelled arbitration of Mrs. Baker's claim because she had signed
23 the arbitration agreement, but not Mr. Baker's claim.  Id. at 292.

24         Plaintiffs' final authority, Buckner v. Tamarin, 98 Cal. App.
25 4th 140 (Ct. App. 2002), is also distinguishable.  In Buckner, the
26 decedent had signed an arbitration agreement purporting to bind
27 his heirs.  Id. at 141.  His grown children brought an action for

17

wrongful death. Id. Unlike the present action, the decedent's spouse was not a co-plaintiff and the plaintiffs did not bring any claims on behalf of the estate. Here, the Plaintiffs include, in addition to Mr. Clay's grown children, his wife, suing individually and on behalf of his estate. As noted above, the estate must submit to arbitration. The Buckner court distinguished its facts from those in the Herbert line of cases in part because there was no plaintiff or group of plaintiffs in Buckner that was required to arbitrate, so there was no concern of splitting a wrongful death suit across forums or reaching inconsistent results. Id. at 142-43.

The Court finds the facts in Herbert more analogous, and adopts the reasoning of that case and its progeny. The Herbert plaintiffs were the wife, five minor children, and three adult children of the decedent. 169 Cal. App. 4th at 720. They brought a suit for wrongful death, fraud, and negligent infliction of emotional distress against hospital, health plan, and doctors involved in Mr. Herbert's care. Id. at 721. The decedent's estate also filed claims for medical negligence and fraud, but those claims were dropped after the defendants filed a motion to compel arbitration. Id. As here, the arbitration agreement in Herbert applied to any claim brought by the health plan member or his heir or personal representative. Id. at 720. The court found that the decedent's wife was bound by the arbitration agreement. Id. at 723. The court relied on a prior decision which found that the fiduciary relationship between spouses establishes the power to contract for health care on one another's behalf, which implies

18

the authority to agree on one another's behalf to arbitrate claims arising out of that health care. Id. (citing Hawkins v. Super. Ct., 89 Cal. App. 3d 413, 418-19 (Ct. App. 1979)). Here, Rodney and Deborah Clay were both enrolled in the Health Plan through Deborah Clay's employer, and Deborah Clay remains enrolled. Dean Decl. ¶ 3. That is sufficient basis to bind Mrs. Clay to the arbitration provisions.

The Herbert court found that because some of the plaintiffs were bound by the arbitration agreement, the remaining plaintiffs had to submit their wrongful death claims to arbitration, regardless of the fact that they had signed the agreement. 169 Cal. App. 3d at 725. Under the "one action rule," "there may be only a single action for wrongful death, in which all heirs must join. There cannot be a series of such suits by individual heirs." Gonzales v. S. Cal. Edison Co., 77 Cal. App. 4th 485, 489 (Ct. App. 1999). "Because a wrongful death cause of action may not be split, the case must be tried in a single forum." Herbert, 169 Cal. App. 3d at 722.

In addition to the one action rule requiring that all the heirs litigate together, the Herbert court identified other policy concerns favoring arbitration of all the heirs' claims:

> [I] it is obviously unrealistic to require the signatures of all the heirs, since they are not even identified until the time of death, or they might not be available when their signatures are required. Furthermore, if they refused to sign they should not be in a position possibly to delay medical treatment to the party in need. Although wrongful death is technically a separate statutory cause of action in the heirs, it is in a practical sense derivative of a cause of action in the deceased.

Id. at 725. The Herbert facts are very similar to those now before the Court, and the Herbert reasoning is persuasive. The Court therefore holds that the arbitration agreement in the EOC, which binds the estate and Mrs. Clay, also binds the remaining Plaintiffs.

**IV.  CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendants' Motion to Compel Arbitration and ORDERS as follows:

1. Plaintiffs are hereby ORDERED to submit all claims other than that seeking injunctive relief to binding arbitration.
2. This action is hereby stayed pending the outcome of the arbitration, pursuant to 9 U.S.C. § 3.

IT IS SO ORDERED.

December 14, 2007

_____
UNITED STATES DISTRICT JUDGE